THIS OPINION IS A
PRECEDENT OF
THE T.T.A.B.

Mailed: March 20, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————

**Trademark Trial and Appeal Board**

————————

In re Tennis Industry Assn.

————————

Serial No. 77836610

————————

Nathan J. Breen of Howe & Hutton Ltd. for Tennis Industry
Assn.

Andrew C. Leaser, Trademark Examining Attorney, Law Office
112 (Angela Wilson, Managing Attorney).[1]

————————

Before Seeherman, Cataldo and Lykos,
Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

Tennis Industry Assn. ("applicant") filed an

application to register in standard characters on the

Principal Register TENNIS INDUSTRY ASSOCIATION as a mark

for the following services, as amended:

> association services, namely, promoting the
> interests of tennis facilities, tennis
> manufacturers, tennis retailers and tennis court
> contractors; providing market research services

———————————————————

[1] The above application originally was examined by another
examining attorney, but was reassigned after the first Office
action to the attorney whose name is shown.

to track the economic vitality of the tennis
industry

in International Class 35.[2]

### Prosecution History

In the first Office action, the examining attorney
refused registration under Section 2(e)(1) of the Trademark
Act, 15 U.S.C. § 1052(e)(1), on the ground that the
proposed mark merely describes a function, feature or
characteristic of the recited services.  In addition, the
examining attorney required a disclaimer of ASSOCIATION,
suggested that applicant amend its application to seek
registration on the Supplemental Register, and required
amendment of the recitation of services.  In response,
applicant submitted the required disclaimer, but did not
respond to the requirement to amend its recitation of
services and did not seek amendment of the application to
seek registration of its mark on the Supplemental Register.
In the second Office action, the examining attorney
continued the refusal to register under Section 2(e)(1),
and further advised applicant that amendment to the
Supplemental Register was no longer recommended because the

---

[2] Application Serial No. 77836610 was filed on September 28, 2009
based upon applicant's assertion of March 15, 1974 as a date of
first use of the mark anywhere and April 15, 1974 as a date of
first use of the mark in commerce in connection with the
services.

proposed mark appeared to be generic. The examining attorney continued the requirement of applicant to amend its recitation of services. In response, applicant amended its recitation of services as shown above and submitted arguments and evidence of its use of the mark which the examining attorney construed as an amendment to seek registration under Trademark Act Section 2(f), 15 U.S.C. § 1052(f). In the third Office action, the examining attorney rejected applicant's showing of acquired distinctiveness because the proposed mark appeared to be generic, but also asserted that, even if the mark were not generic, applicant's showing of acquired distinctiveness was insufficient, and continued the refusal to register on the ground of genericness. When the refusals were made final, applicant appealed. Applicant and the examining attorney filed briefs on the issues under appeal, and applicant filed a reply brief.

### Propriety of the Refusals to Register

Applicant argues at length in its responses to the second and subsequent Office actions and in its briefs that the current examining attorney "violated TMEP §§ 704.01 and 706"[3] in his examination of the involved application.

---

[3] Applicant's brief, p. 4.

Specifically, applicant argues that TMEP § 704.01 requires the examining attorney to raise all grounds for refusal and all requirements in the initial examination of the application, and that "[i]t was not until Applicant had already responded to the first Office Action that the issue of genericness that is the subject of this Appeal was raised for the first time."[4]  Applicant further argues that "in raising the genericness issue without any additional explanation or apology, the Examiner has violated TMEP § 706."[5]

We disagree.  In fact, and contrary to applicant's assertion, the Examining Attorney did refuse the application on the ground of genericness at the appropriate time, which was not until applicant raised the issue of acquired distinctiveness in its response of February 5, 2010.  TMEP § 1209.02(a)(ii).  As explained in TMEP § 1209.02(a), "the examining attorney must not initially issue a refusal in an application for registration on the Principal Register on the ground that a mark is a generic name for the goods or services" except for a situation not applicable to the instant application, and that "even if it appears that the mark is generic, the proper basis for the

---

[4] *Id.*
[5] *Id.*

4

initial refusal is Section 2(e)(1) descriptiveness." In this case, both the initial and subsequent Office actions refused the application under Section 2(e)(1). Although the examining attorney initially suggested that applicant amend its application to the Supplemental Register, subsequent direction that such amendment would be inappropriate does not constitute a new requirement or refusal. Further, applicant did not amend its application to seek registration on the Supplemental Register in response to the examining attorney's initial suggestion, and therefore the examining attorney's subsequent withdrawal of that suggestion did not cause applicant any inconvenience or wasted effort.[6]

## Issues on Appeal

The issues under appeal in this case are whether the designation TENNIS INDUSTRY ASSOCIATION is generic for the recited services and, if not found to be generic, whether applicant has made a sufficient showing of acquired distinctiveness under Section 2(f) with regard thereto.

Genericness Refusal

---

[6] We also point out that if an applicant believes assertion of a refusal is procedurally deficient, the appropriate procedure is to file a petition to the Commissioner within two months of the complained-of action. See Trademark Rule 2.146(a) and 2.146(d); *In re Greenliant Systems Ltd.*, 97 USPQ2d 1078, 1080, n.3 (TTAB 2010), *citing In re Jump Designs LLC.*, 80 USPQ2d 1370, 1373 (TTAB 2006); and *In re Sambado & Sons Inc.*, 45 USPQ2d 1312 (TTAB 1997).

As a preliminary matter, we note that inasmuch as applicant seeks registration of the mark TENNIS INDUSTRY ASSOCIATION on the Principal Register pursuant to Section 2(f), applicant has effectively conceded that the mark is descriptive. *See The Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 586 F.3d 1352, 92 USPQ2d 1626, 1629 ("where an applicant seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive."). *See also In re Country Music Association Inc.*, 100 USPQ2d 1824 (TTAB 2011).

Now we turn to our genericness analysis. A mark is a generic name if it refers to the class or category of goods and/or services on or in connection with which it is used. *In re Dial-A-Mattress Operating Corp.,* 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001), *citing H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc.,* 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986) ("*Marvin Ginn*"). The test for determining whether a mark is generic is its primary significance to the relevant public. Section 14(3) of the Trademark Act; *In re American Fertility Society,* 188 F.3d 1341, 51 USPQ2d 1832 (Fed. Cir. 1999); *Magic Wand Inc. v. RDB Inc.,* 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991);

and *H. Marvin Ginn, supra.*

The USPTO has the burden of establishing by clear evidence that a mark is generic and, thus, unregistrable. *In re Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 828 F.2d 1567, 4 USPQ2d 1141 (Fed. Cir. 1987). *See also In re American Fertility Society, supra;* and *Magic Wand Inc. v. RDB Inc., supra.* "Doubt on the issue of genericness is resolved in favor of the applicant." *In re DNI Holdings Ltd.,* 77 USPQ2d 1435, 1437 (TTAB 2005).

Our first task under *Marvin Ginn* is to determine, based on the evidence of record, the genus of applicant's services. In this case, we agree with applicant that the genus of services at issue is adequately defined by applicant's recitation of services, specifically,

> association services, namely, promoting the interests of tennis facilities, tennis manufacturers, tennis retailers and tennis court contractors; providing market research services to track the economic vitality of the tennis industry.

*See e.g. In re Trek 2000 Int'l Ltd.,* 97 USPQ2d 1106, 1112 (TTAB 2010) ("the genus of goods at issue in this case is adequately defined by applicant's identification of goods…"). This is confirmed by applicant's specimen of use (an excerpt from its web site), describing applicant's mission as "promoting the growth and economic vitality of

tennis."

Next, we must determine whether the designation TENNIS INDUSTRY ASSOCIATION is understood by the relevant purchasing public primarily to refer to that genus of services. Our first task is to define the "relevant purchasing public." We note that neither applicant nor the examining attorney has defined the relevant purchasing public in this case. Based upon the record evidence, we find that the relevant purchasing public consists of those whose interests are promoted by applicant's identified services.

With this in mind, we must now ascertain whether the designation TENNIS INDUSTRY ASSOCIATION is understood by the relevant purchasing public as primarily referring to

> association services, namely, promoting the
> interests of tennis facilities, tennis
> manufacturers, tennis retailers and tennis court
> contractors; providing market research services
> to track the economic vitality of the tennis
> industry.

We begin by finding that the designation TENNIS INDUSTRY ASSOCIATION is a phrase and should be analyzed according to the test set forth in the case of *In re American Fertility Society, supra,* and further clarified in the case of *In re Dial-A-Mattress Operating Corp.,* 57 USPQ2d at 1810:

> [W]here the proposed mark is a phrase (such as
> "Society for Reproductive Medicine"), the board

8

> "cannot simply cite definitions and generic uses
> of the constituent terms of a mark"; it must
> conduct an inquiry into "the meaning of the
> disputed phrase as a whole."

*In re The Am. Fertility Soc'y,* 51 USPQ2d at 1836. *Cf. In re Gould Paper Corp.*, 834 F.2d 1017, 1018, 5 USPQ2d 1110, 1110 (Fed. Cir. 1987). By way of illustration, the Federal Circuit provided the following example in *In re American Fertility Society*:

> AMERICAN BAR ASSOCIATION is certainly an apt name
> for a national association of lawyers; however,
> it is not used as a generic name for national
> associations of lawyers (see, e.g., NATIONAL
> ASSOCIATION OF WOMEN LAWYERS; FEDERAL BAR
> ASSOCIATION; AMERICAN HEALTH LAWYERS ASSOCIATION;
> NATIONAL LAWYERS ASSOCIATION).

*Id.* at 1836. *See also In re Country Music Association Inc.*, 100 USPQ2d 1824 (TTAB 2011).

We turn now to the evidence of record. Competent sources to show the relevant purchasing public's understanding of a contested term include purchaser testimony, consumer surveys, dictionary definitions, trade journals, newspapers and other publications. *In re Dial-A-Mattress Operating Corp., supra;* and *In re Bed & Breakfast Registry,* 791 F.2d 157, 160, 229 USPQ 818, 819 (Fed. Cir. 1986).

In this case, the examining attorney has made of record the following five examples of "tennis industry

association" displayed in lower case, *i.e.*, a manner that does not appear to indicate source in any particular entity, taken from the Lexis/Nexis database and commercial and informational Internet websites (emphasis added):

> There have been times – a small handful of them – when Alan Gifford Schwarts has not been well served by his bottomless drive. …
> On Jan. 1, the longtime Highland Park resident took over as president of the U.S. Tennis Association, overseeing an organization with 670,000 members, an annual budget of $200 million and stewardship of one of the sport's most prestigious events, the U.S. Open. …
> "I hope to forge more and better relationships between teaching groups, parks and rec associations, and **tennis industry associations**. I want to burnish the image of tennis. I want us to get out of our elitism." …
> (Chicago Tribune January 13, 2003 Sunday Chicagoland Final Edition);

> … Similar efforts are underway nationwide. In 1997, officials from the United States Tennis Association, the men's and women's professional tours, the **tennis industry association** and other groups, concerned by a decline in participation in the sport, joined forces to create the USA Tennis Plan for Growth. The five-year, $50 million plan aims to expand the game by funding programs in urban areas, offering lessons and providing grants to talented minority youths to offset the costs of training and competition. …
> (The Times Picayune (New Orleans, LA) October 7, 2000);

> Free tennis lessons will be offered to the public June 9-18 during a national campaign to revitalize the sport. More than 25 sites around the metro area will offer free, 90-minute introductory lessons during morning, afternoon and evenings.

The United States Professional Tennis Association and the U.S. Tennis Association are spearheading the local effort. The goal of the **tennis industry association** Play Tennis America campaign is to bring a half-million new players into the sport.
(The Denver Post May 31, 1995);

Maintaining accurate and consistent information is difficult to do in largely staffed programs, however, it is important for the good of young players. I refer to this as "Program Integrity." The **tennis industry associations** in general, although amazing in their wealth of knowledge and research, have remained flexible to change as well as they have often adopted a "many ways to teach tennis" attitude, still leaving much room for a lack of accuracy in teaching by newly certified instructors. …
(maxfabiani.com); and

My Three Main Initiatives are:
1. To integrate a component of mandatory education into our certification process.
2. To grow our membership both domestically and internationally, and to increase our efforts to work in partnership and cooperatively with other **tennis industry associations**, especially in those areas that positively impact our job market.
3. To form one unified tennis-teaching organization in the United States.
   (addvantageuspta.com).

The examining attorney further has made of record evidence of non-trademark use of "tennis industry" from the Lexis/Nexis database, of which the following examples are illustrative:

… Founded in 1927, the USPTA is the world's oldest and largest trade association of tennis-teaching professionals. The USPTA headquarters

11

is in Houston, Texas.
The USPTA's purpose is to raise the standards of the tennis-teaching profession and to increase interest and awareness in tennis. The USPTA is the fastest growing **association in the tennis industry** in the world.
(Tulsa World (Oklahoma) January 8, 1998);

… Fast-forward to 1994, when Sports Illustrated asked "Is Tennis Dying?" The "Battle of the Sexes," with Billie Jean King and Bobby Riggs, and rivalries between McEnroe/Connors and Evert/Navratilova were way in the past; participation had dropped 40 percent from more than 30 million at tennis' peak in the 1970s.
But leaders in the **tennis industry** – equipment manufacturers, governing bodies and professionals - took this as a challenge to change rather than as match point.
They decided that, instead of marketing individual brands, they would market "tennis," pouring millions of dollars into grassroots programs geared to promoting participation everywhere.
(The Denver Post August 24, 2009);

Tennis is a passion for Mike Sherer.
So is teaching tennis, which makes his newest position at Indiana University East a perfect fit.
Sherer will guide the Red Wolves' men's and women's tennis teams as they begin their inaugural seasons this fall.
"I've been in the **tennis industry** all my life," said Sherer, 51. "I welcome the challenge, and I'm very anxious to get started." …
(Palladium-Item (Richmond, IN) May 17, 2009);

Tennis Welcome Centers are public or private facilities that offer programs for new and experienced players of all ages and abilities.
"The Tennis Welcome Center Awards is a wonderful opportunity for the **tennis industry** to recognize the locations that are taking the steps to create

a positive experience for those who are discovering and rediscovering tennis, which in turn helps grow the sport," Jolyn de Boer, association executive director, said in a news release. …
(Contra Costa Times (California) June 25, 2008); and


A tennis professional and coordinator of junior team tennis and junior excellence for the Williamson County Parks & Recreation tennis program, Hains is a veteran of 26 years in the **tennis industry**.  He has been a member of the U.S. Professional Tennis Association since 1980, has served as state president on the Southern Division board of officers and has received numerous awards, including "Tennessee State Professional of the Year" and "Pride of the South."  Hains began his tennis career as a high school, state university and men's tournament player in Pennsylvania and Delaware. …
(The Tennessean (Nashville, Tennessee) August 24, 2006).

The examining attorney also submitted evidence from applicant's Internet website, of which the following examples are illustrative:

The Tennis Industry Association, the not for profit trade association for tennis, is THE unifying force in the **tennis industry** whose mission is to promote the growth and economic vitality of tennis by working closely with the U.S. Tennis Association and industry partners to develop and implement initiatives to increase tennis participation and improve the health of industry businesses. …
(tennisindustry.org);


4th Annual TIA Tennis Forum
Held in conjunction with the 40th Annual USTA Tennis Teachers Conference, the Forum will present the latest news about the state of the

**tennis industry**, including participation growth, equipment sales data, grassroots initiatives and more.  Importantly, the Forum will outline pathways to increasing the number of frequent players in the U.S., ways to better define and boost the economic growth and impact of the **tennis industry**, and effective ways to distribute clear, consistent messaging of health, fitness and the reasons to play tennis.  In addition, the TIA will have the 3rd Annual Hall of Fame Induction during the Tennis Forum. (tennisindustry.org);

A new online registration system has been developed to allow you to sign up your players for the QuickStart Tennis play format, which has become an integral component of tennis for kids 10 & under and a primary focus of the USTA and **tennis industry**.  In addition, you can collect payment and communicate with consumers using detailed, specific and targeted messaging to enhance your business. … (tennisindustry.org); and

The TIA's mission is to unify the **tennis industry** and the representative companies involved in the manufacturing, marketing, and sales of tennis products along with tennis publications, tennis management firms, and other allied organizations in tennis.  The TIA holds trade shows, forums and educational seminars to serve as the rallying point for the industry. (tennisindustry.org).

The Examining attorney submitted additional evidence from third-party Internet websites, of which the following examples are illustrative:

Ryan Melton (Francis Marion)
In spring of 2009 Ryan graduated top of his class and received the Mark Blackwell Award for the graduate with the highest GPA over their college career (4.0).  He also received the School of

Business Management Award, the FMU Scholastic Achievement Award, and the Duane P. Myers Honors Award.  In 2009 Ryan began working as a project coordinator with the Tennis Industry Association, a trade **association** for the **tennis industry**. (jspr.sc.edu);


The **tennis industry** continues to boom, and brings millions upon millions in annual revenues.  The ATP Tour, WTA Tour, Senior Tour, Satellites, Challengers, Davis Cup, College tennis and more continue to expand along with tennis-related ventures by corporate giants, meaning job opportunities are increasing daily. JobsinTennis.com lists all levels of job opportunities with the **tennis industry** including internships, entry-level, management, and executive level positions in the following fields … (jobsintennis.com);


The Tennis Channel, the only 24-hour, television-based multimedia destination dedicated to tennis and the healthy, active lifestyle that surrounds it, today announced the hiring of longtime tennis executive David Egdes as senior vice president, Tennis Industry Relations, and Tennis Channel Open tournament director. … Based in Los Angeles, Egdes will report to the Tennis Channel chairman and CEO Ken Solomon.  In this position he will guide the **tennis industry** relations department, and act as a liaison between the sponsors, manufacturers and retailers. … (tennischannel.com);


Webtennis24.com Tennis lessons, techniques, drills and games…all free! This site has been created to provide free quality tennis instruction, drills and tips for players, coaches and parents from all over the world.  You can also find tennis videos of top professionals and news from the **tennis industry.**

Enjoy the site!
(webtennis24.com);


Popularity of tennis is surging once again.
The United States Tennis Association estimated
there were 35 million Americans playing the sport
in the early '80s.  This country had a unique
interest in tennis for several reasons. …
"People left tennis in droves," Jerry Noyce said.
"According to the USTA, we were down to 14
million tennis players in 1993.  The way it was
going, we probably would be down to 10 million by
now, if the USTA and the **tennis industry** didn't
get together and decide they had to do something
about it." …
(highbeam.com);

In addition, the examining attorney made of record

third-party registrations for various marks incorporating

the terms INDUSTRY and ASSOCIATION and/or TENNIS in which

such terms are disclaimed in marks registered for a variety

of association and other services on the Supplemental

Register and on the Principal Register under Section 2(f).

The following examples are illustrative:

Registration No. 1295291 on the Supplemental
Register for TRAVEL INDUSTRY ASSOCIATION OF
AMERICA ("TRAVEL" "INDUSTRY" and "ASSOCIATION"
disclaimed) for "Association Services-Namely,
Promoting the Business and Interests of Members
by Promoting Tourism and Travel to and within the
Borders of the United States";

Registration No. 2113112 on the Supplemental
Register for the mark BUILDING INDUSTRY
ASSOCIATION OF SOUTHEASTERN MICHIGAN (BUILDING
INDUSTRY ASSOCIATION disclaimed) for "association
services, namely, promoting the interests of
members of the building industry";

16

Registration No. 1967714 on the Principal
Register under Section 2(f) for UNITED STATES
TENNIS ASSOCIATION (TENNIS ASSOCIATION
disclaimed) for, *inter alia*, "association
services, namely promoting the interests of
tennis athletes and umpires"; and

Registration No. 3067251 on the Principal
Register under Section 2(f) for the mark HAMILTON
COUNTY COMMUNITY TENNIS ASSOCIATION (COMMUNITY
TENNIS ASSOCIATION disclaimed) for "Educational
services, namely, conducting workshops and
classes in the field of tennis; recreational
services in the nature of tennis and tennis
camps; entertainment services, namely, promoting
and conducting tennis tournaments and
exhibitions."

Finally, the examining attorney submitted dictionary
definitions of the terms comprising TENNIS INDUSTRY
ASSOCIATION taken from merriam-webster.com. According to
these definitions, TENNIS is defined as "an indoor or
outdoor game that is played with rackets and a light
elastic ball by two players or pairs of players on a level
court (as of clay or grass) divided by a low net"; INDUSTRY
is defined as "a distinct group of productive or profit-
making enterprises <the banking industry>"; and ASSOCIATION
is defined as "an organization of persons having a common
interest."

In support of its position that TENNIS INDUSTRY
ASSOCIATION is not generic for its recited services, but
rather has acquired distinctiveness under Section 2(f),
applicant submitted a voluminous number of articles from

the Westlaw database, all discussing applicant and

displaying the applied-for designation in initial typed

capital letters, *i.e.*, "Tennis Industry Association."  The

following examples are illustrative:

> … Nothing kick-starts weight loss like chasing
> down a drop shot with "Don't Stop 'Til You Get
> Enough" playing courtside.  Music is a major
> component of cardio tennis because research shows
> that it improves workout performance, said Jolyn
> de Boer, the executive director of the Tennis
> Industry Association. …
> (New York Times, June 4, 2010);


> … According to a recent survey by Taylor Research
> and Consulting Group for the United States Tennis
> Association and the Tennis Industry Association,
> tennis has experienced a recreational upswing
> across all age groups, especially among blacks
> and Hispanics.  This year participation in the
> country rose above 30 million for the first time
> in more than two decades.  Between 2003 and 2008,
> before the recession, youth racket sales rose by
> 50 percent. …
> (New York Times, February 5, 2010);


> … Nationally 30.1 million people play tennis,
> according to a survey of the Tennis Industry
> Association, with 7.1 million players taking up
> the sport for the first time last year. …
> (Tallahassee Democrat, February 5, 2010);


> Royal Oak resident Ralph Colone, 64, has played
> tennis for two decades.  But it's only in the
> past two years that the sport has truly sent his
> heart into a flutter.  That's when Colone first
> heard of cardio tennis, a growing fitness trend.
> More than a million people have tried it, said
> Michele Krause, the national cardio tennis
> manager for the Tennis Industry Association. …
> (Detroit Free Press, November 8, 2009);

While the recession has served its share of double faults, Long Islanders are still out there serving and volleying, perhaps in numbers even greater than before. …
That's the sentiment of those in the tennis industry on Long Island, and a validation of the Sporting Goods Manufacturers Association report that cites tennis as the fastest-growing individual sport in the first part of the 21st Century.  The Tennis Industry Association says participation in the game has grown 43 percent over the last eight years. …
(Newsday, October 18, 2009);

Cardio Tennis, a high-energy fitness routine that gets the blood pumping, is growing in popularity. … Part aerobics class, part tennis drills, the concept debuted in New York in 2005, but it is only now getting a toe-hold in Central Florida. In large part, it's an attempt by the USTA and the Tennis Industry Association to compete with YMCAs and gyms for the growing number of fitness-minded customers – and to give teaching pros a steady source of income. …
(Orlando Sentinel, April 3, 2007);

How's the health of tennis in the United States? … "The sport's been basically flat in participation for years," said Jim Baugh, president of the Tennis Industry Association, which represents tennis marketers, facilities and equipment makers. …
(Philadelphia Inquirer (PA) April 6, 2004);

Judy Levering is using the distinction of being the first woman president of the U.S. Tennis Association to her advantage.  In no way does she consider her gender to be a disadvantage. … According to the latest census report from the Tennis Industry Association, (TIA), play is up this year based on first quarter sales of tennis balls, which is considered the best measure. …

(St, Paul Pioneer Press (MN) June 25, 2000);

… Other changes at the biggest non-Grand Slam tournament in the United States include two courts for a program called Play Tennis America where coaches such as Nick Bollestieri and others will host clinics and a charity concert two days before play begins. … The national Tennis Industry Association, based in North Palm Beach, is bringing its free lessons program home next month.  New and former players, adults and kids are eligible for a 90-minute group lesson and introduction to the sport. …
(Palm Beach Post (FL) January 13, 1998);

SPORTS TENNIS First lesson's free for new players learning to play.
For anyone who ever wanted to learn to play tennis, there may never be a better time in Atlanta. … The nationwide program, called Play Tennis America, is sponsored by the Tennis Industry Association.  The TIA's national goal is to introduce the game to a half-million players in three years. …
(Atlanta Journal and Constitution (GA) April 27, 1995); and

Courting the Fans Tennis Has Hit A Pivotal Point … "Tennis is taking a beating," says Brad Paterson, executive director of the Tennis Industry Association.  Participation has plummeted from its height of 35 million in 1978 to 22 million last year. …
(USA Today, September 7, 1994).

Applicant further made of record third-party "INDUSTRY ASSOCIATION" formative marks registered on the Principal Register under Section 2(f) for a variety of association services in which only ASSOCIATION was disclaimed.  The following examples are illustrative:

20

Registration No. 3348669 for the mark OUTDOOR INDUSTRY ASSOCIATION for, *inter alia*, "association services, namely promoting the interests of members of the Outdoor Industry Association";

Registration No. 3010643 for the mark PERSONAL WATERCRAFT INDUSTRY ASSOCIATION for "association services - namely promoting the interests of manufacturers and users of personal watercraft";

Registration No. 2954764 for the mark TREE CARE INDUSTRY ASSOCIATION for "association services, namely, promoting the interests of those in the tree care industry";

Registration No. 3840879 for the mark CONSUMER DATA INDUSTRY ASSOCIATION for "association services, namely, promoting the interests of those involved in the consumer credit reporting information industry";

Registration No. 3770581 for the mark SOLAR ENERGY INDUSTRIES ASSOCIATION for, *inter alia*, "association services, namely, promoting the interests of the solar energy industry";

Registration No. 3348659 for the mark OUTDOOR INDUSTRY ASSOCIATION for, *inter alia*, "association services, namely promoting the interest of members of the Outdoor Industry Association"; and

Registration No. 2954764 for the mark TREE CARE INDUSTRY ASSOCIATION for "association services, namely, promoting the interests of those in the tree care industry."

Applicant also made of record copies of third-party registrations for various ASSOCIATION-formative marks, all registered on the Principal Register under Section 2(f) with a disclaimer of only "ASSOCIATION" for a variety of

21

association services.  The following examples are illustrative:

Registration No. 3831792 for the mark ASSOCIATION OF CORPORATE COUNSEL for, *inter alia*, "association services, namely, promoting the interests, professional advancement and education of corporate legal counsel, and fostering relations, communications and exchanges of ideas between corporate legal counsel, academics, professionals, students and other persons";

Registration No. 3271551 for the mark COMMERCIAL MORTGAGE SECURITIES ASSOCIATION for "association services, namely, an association that informs and educates the public and the association's members of trends in the commercial mortgage-backed securities market";

Registration No. 3290586 for the mark ELECTRIC POWER SUPPLY ASSOCIATION for, *inter alia*, "trade association services, namely, promoting the interests of power suppliers, independent generators and power marketers";

Registration No. 3079065 for the mark ETHICS OFFICER ASSOCIATION for, *inter alia*, "association services, namely, promoting the interests of corporate executives in the field of ethics compliance and business conduct"; and

Registration No. 3272039 for the mark INTERNATIONAL MOUNTAIN BIKING ASSOCIATION for "association services, namely, promoting the interests of mountain bikers; to create, enhance and preserve trail opportunities for mountain bikers worldwide."

Finally, applicant made of record copies of one of its press releases and an annual report, excerpted below:

TIA Tennis Forum Reviews Industry, Sets Path for Future
Increasing the number of frequent players, promoting QuickStart Tennis and developing a

single tennis web portal for consumers are cited as ways to increase and sustain growth.
Hilton Head Island, S.C. (Sept. 24, 2009) – The third annual Tennis Industry Association Tennis Forum, presented by Tennis Magazine, took place in New York City during the US Open and brought together industry leaders and many others interested in the future of the tennis business. The audience heard about the state of the industry, various TIA and Growing Tennis initiatives, and plans for moving the sport and industry forward. …
(September 24, 2009 press release); and

2008 Year-End Executive Summary
Research and Market Intelligence Highlights
The growth in tennis participation made headlines in 2008, as the number of players in the U.S. increased to nearly 27 million (see page 4) and the number of play occasions grew, too.  This upward trend in participation is expected to continue, which is the good news.  The bad news is the economy and changing consumer habits, which are affecting many tennis businesses and their profitability. …
(The Tennis Marketplace 2008 Executive Summary, Volume 9 Issue 1).

As noted above, the Office bears the burden of proof and genericness must be shown by clear evidence. Furthermore, any doubts must be resolved in applicant's favor. *In re DNI Holdings Ltd, supra.*

Genericness is a fact-intensive determination and the Board's conclusion must be governed by the record which is presented to it.  On balance we find that the Office has not met its difficult burden of establishing by clear evidence that the designation TENNNIS INDUSTRY ASSOCIATION,

23

Ser. No. 77836610

as a whole, is generic for the genus of

> association services, namely, promoting the
> interests of tennis facilities, tennis
> manufacturers, tennis retailers and tennis court
> contractors; providing market research services
> to track the economic vitality of the tennis
> industry.

We begin by noting the paucity of evidence of record (five examples) showing the phrase TENNIS INDUSTRY ASSOCIATION displayed in a manner that does not appear to be trademark use. That is to say, there are only five examples, excerpted above, displaying the applied-for mark as "tennis industry association[s]" without any capitalization or other indication that the term is intended to indicate source in any particular entity. Further, in two of the articles, despite the fact that the term is not capitalized, it is not clear that the term is being used generically. In fact, applicant states that one of these examples, the May 31, 1995 Denver Post article, actually is a reference to itself;[7] and applicant's evidence of record supports a finding that the article indeed discusses applicant and its Play Tennis America program.

The examining attorney argues that the record demonstrates that TENNIS INDUSTRY is generic and ASSOCIATION is generic and that, as a result, when these

---

[7] Applicant's reply brief, p. 5.

"terms are combined, the applied-for mark as a whole maintains its generic nature, as it refers to a specific type of association, namely, an association that promotes the interests of the tennis industry."[8] In support of this position, the examining attorney primarily relies upon cases involving marks consisting of the top level domain indicator (TLD) ".com" combined with a generic term. *See 1800Mattress.com IP LLC*, 92 USPQ2d 1682 (Fed. Cir. 2009) (MATTRESS.COM); *In re Hotels.com*, *L.P.*, 91 USPQ2d 1532 (Fed. Cir. 2009) (HOTELS.COM); and *In re Oppendahl & Larson LLP*, 71 USPQ2d 1370 (Fed. Cir. 2004) (PATENTS.COM).

However, those cases all involved marks that consist of a single generic term and the TLD ".com" which was found to have no source-identifying capacity. As discussed above, TENNIS INDUSTRY ASSOCIATION is a phrase as contemplated by *American Fertility Society* and we cannot base our determination on the meanings of its constituent terms, *i.e.*, TENNIS INDUSTRY and ASSOCIATION, but must consider the meaning of the phrase constituting the mark as a whole. *Id*. at 1836. A mere three unambiguous examples of generic usage of TENNIS INDUSTRY ASSOCIATION simply is insufficient to support the genericness refusal. The examining attorney's remaining Lexis/Nexis and Internet

---

[8] Examining attorney's brief, unnumbered page 10.

evidence suggests that TENNIS INDUSTRY has a recognized meaning and that TENNIS INDUSTRY ASSOCIATION is an apt name for an association of tennis industry members, but not that the mark is generic for the recited association services. *Id.* Again, we note that the Federal Circuit has drawn a clear distinction between an apt name and a generic one: "AMERICAN BAR ASSOCIATION is certainly an apt name for a national association of lawyers; however, it is not used as a generic name for national associations of lawyers." *Id*. The third-party registrations made of record by applicant and the examining attorney serve to illustrate that, as has been said many times, each case must be decided on its own facts. *See, e.g., AMF Inc. v. Am. Leisure Products, Inc.*, 177 USPQ 268 (CCPA 1973); and *In re Sunmarks, Inc.*, 32 USPQ2d 1470 (TTAB 1994).

Thus, based on the entirety of the record before us, we have substantial doubt about whether TENNIS INDUSTRY ASSOCIATION is perceived by the relevant public as a generic name for the recited services. Such doubt must be resolved in applicant's favor.

Acquired Distinctiveness

Applicant has the burden to establish a prima facie case of acquired distinctiveness when registration is sought under Section 2(f). *See Yamaha International Corp.*

26

*v. Hoshino Gakki Co., Ltd*., 840 F.2d 1572, 6 USPQ2d 1001, 1006 (Fed. Cir. 1988). The greater the degree of descriptiveness, the greater the evidentiary burden on the user to establish acquired distinctiveness. *See Yamaha Int'l. Corp. v. Hoshino Gakki Co.,* 6 USPQ2d at 1008*; and In re Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 4 USPQ2d at 1144*.* The sufficiency of the evidence offered to prove secondary meaning must be evaluated in light of the nature of the designation. Highly descriptive terms are less likely to be perceived as trademarks, and therefore more substantial evidence of secondary meaning thus will ordinarily be required to establish their distinctiveness.

In support of its claim of acquired distinctiveness, applicant submitted a copy of its September 24, 2009 press release, a copy of its 2008 annual report containing an overview of its research into the tennis industry for that year, and 499 articles from the Westlaw database discussing applicant and its various programs, in which applicant is identified as "Tennis Industry Association." In addition, applicant relies upon its use in commerce of TENNIS INDUSTRY ASSOCIATION as a mark since 1974, and a statement by its counsel in its August 19, 2010 response to the examining attorney's Office action that between 1995 and

2006, applicant "spent $465,785 in promotional expenses and nearly $16.5 million on grassroots tennis programs."

The 499 Westlaw articles, while voluminous, are less probative than they might otherwise be for several reasons. Applicant asserts that "these articles represent the full results of a search for 'tennis industry association' in the Westlaw legal research software United States news database, and the results extend back nearly twenty years."[9] We note, however, that several of the articles are duplicates from the same publication on the same date, thus reducing the number of articles of record. Second, certain of the articles do not feature stories about applicant or its programs, but simply mention applicant in the larger context of stories concerning other tennis organizations or the subject of tennis and fitness in general, such that applicant's mark is not likely to be noted. Third, the articles span a 16 year period from 1994 to 2010. Even if none of the articles were duplicates, publication of 499 articles over 16 years is not necessarily compelling evidence that the relevant public has come to recognize TENNIS INDUSTRY ASSOCIATION as a source-identifier for applicant's services, particularly when only a small

---

[9] Applicant's brief, p. 9.

percentage of them appear to be from the 2009-10 time period.

Similarly, the statement of applicant's counsel regarding applicant's promotional expenditures and expenditures on its grassroots tennis program over the 11-year period between 1995 and 2006 list only the numbers involved. Applicant's mere assertion that it spent nearly $500,000 in promotional expenses and $16.5 million in promoting its grassroots tennis program does not provide any explanation of how these expenses translate into recognition of TENNIS INDUSTRY ASSOCIATION as a mark. Applicant has provided no information regarding whether and to what extent the promotions or grassroots tennis program feature TENNIS INDUSTRY ASSOCIATION as a mark as opposed to other terms such as "cardio tennis" and "Play Tennis America" with which applicant is associated. Furthermore, applicant has provided very little information regarding the manner and extent of its promotions or to whom they are directed. Simply put, applicant has provided insufficient detail whereby we may ascertain the impact of its expenditures on the relevant public. Sheer numbers alone are not necessarily enough to prove secondary meaning. *In re Boston Beer Co. L.P.*, 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999) (claim based on annual sales under the

29

mark of approximately $85 million, and annual advertising expenditures in excess of $10 million, not sufficient to establish acquired distinctiveness in view of highly descriptive nature of mark). As for applicant's press release and annual report, again applicant has provided insufficient information to show the extent to which they are disseminated to the relevant public such that we may conclude whether they have contributed to the public's recognition of TENNIS INDUSTRY ASSOCIATION as a mark.

Thus, while the totality of applicant's evidence demonstrates its efforts to promote the sport of tennis, it does not establish that the relevant public has come to view the designation TENNIS INDUSTRY ASSOCIATION as applicant's source-identifying trademark. *See In re Bongrain International Corp*., 894 F.2d 1316, 13 USPQ2d 1727 (Fed. Cir. 1990); and *In re Recorded Books Inc*., 42 USPQ2d 1275 (TTAB 1997). *See also In re Lorillard Licensing Co.*, 99 USPQ2d 1312 (TTAB 2011). The issue here is the achievement of distinctiveness, and the evidence falls short of establishing this. Notably, the record contains little direct evidence that the relevant classes of consumers to whom applicant's services are directed view TENNIS INDUSTRY ASSOCIATION as a distinctive source indicator therefor. *Compare In re Country Music*

*Association Inc.*, *supra*, and the much greater quantity and, in particular, probative value, of evidence of acquired distinctiveness made of record in that case.

Accordingly, even though we have found that the designation TENNIS INDUSTRY ASSOCIATION is not generic, but merely descriptive, given the highly descriptive nature of such designation, we would need to see a greater quantity of probative evidence than what applicant has submitted in order to find that the designation has become distinctive of applicant's services.  As noted above, the greater the degree of descriptiveness, the greater the evidentiary burden on the user to establish acquired distinctiveness. *See Yamaha Int'l. Corp., supra; and In re Merrill Lynch, Pierce, Fenner & Smith, Inc., supra.*

Summary

In coming to our determination, we have considered all of the arguments and evidence presented by applicant and the examining attorney, including any arguments and evidence not specifically discussed herein.

*Decision:*

The refusal under Section 2(e)(1) of the Act on the ground that the proposed mark is so highly descriptive as to be generic is reversed.  However, because applicant has not demonstrated that the mark has acquired distinctiveness

31

and is registrable pursuant to the provisions of Section 2(f), we affirm the refusal under Section 2(e)(1) of the Act on the ground that the mark is merely descriptive.